## Richmond

### VIRGINIA FIRST SAVINGS & LOAN ASSOCIATION

v.

### CAROL M. WELLS, ADMINISTRATRIX OF THE ESTATE OF JEFFERSON L. WELLS, JR., DECEASED

January 21, 1983.

Record No. 800901.

Present: All the Justices.

John A. Douglass *(Murray H. Wright; Robert S. Brewbaker, Jr.; McGuire, Woods & Battle,* on briefs), for appellant.
Morton B. Spero *(Spero and Diehl,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

This case arises from a contract whereby a mortgage lender undertook to procure credit life insurance for a borrower. Carol M. Wells, administratrix of the estate of her deceased husband, Jefferson L. Wells, Jr., sued Virginia First Savings and Loan Association for its breach of an agreement to submit the Wells' application for credit life insurance to an insurance company. At trial, the jury returned a verdict in favor of Mrs. Wells in the amount of the loan balance as it stood on the date of Mr. Wells' death. Virginia First appeals the judgment entered upon this verdict. It contends that the trial court erroneously relieved Mrs. Wells of the burden of proving that Mr. Wells was insurable at the time he applied for credit life insurance. We affirm the judgment.

In August 1973, Mr. and Mrs. Wells applied to Virginia First for a mortgage loan to be used for the purchase of a new home in Colonial Heights. They discussed the matter with Thomas S. Florence, an officer of Virginia First, who also acted as authorized agent for a credit life insurance company. Florence asked them if they desired credit life insurance which would repay the loan in full in the event of the death of Mr. Wells. Upon receiving an affirmative response, Florence filled out an application for insurance which Mr. Wells signed. All copies were retained by Virginia First.

On September 5, 1973, the Wells again went to Virginia First to close the loan transaction. Another officer of Virginia First gave them a document entitled "Notice to Borrowers required by Federal Law, Federal Reserve Regulation Z," which listed "Life Insurance Est.—$67.44" under "Prepaid Finance Charges." Mrs.

Wells testified that she and her husband were told that the monthly premium for credit life insurance covering the full amount of the loan would be $5.62, and that the first twelve such payments, aggregating $67.44, were to be collected in advance out of the loan proceeds. The Regulation Z form, signed by the Wells, contained their request for credit life insurance. It also included the following clause, typewritten under the printed matter relating to credit life insurance: "The issuance of such insurance is subject to submission of an application to the insurer and to approval of issuance of such insurance by insurer."

The practice of Virginia First was to begin collection of credit life insurance premiums at once, and to hold them in escrow until the insurance company accepted the application. Upon receiving notice of acceptance, Virginia First remitted the premiums to the insurance company, received the policy, and placed it in the borrower's file. If the application were rejected, Virginia First would notify the borrower, return the premiums in escrow to him and discontinue the collection of further premiums.

Mrs. Wells testified that Florence told them that the monthly premium of $5.62 would be added to each monthly loan payment, that Virginia First would forward their application to an unnamed credit life insurance company, and that if they were not notified by letter within ten days after closing the loan that the application had been rejected, they were to assume the insurance was in force. It was explained to them that the policy would be held in the file at Virginia First and that they would not receive it.

The original application for insurance cannot be found, but was evidently never forwarded to an insurance company. Virginia First gave the Wells no indication that the policy was not in force, but continued to collect the premiums each month for three years, until September 1976. Mr. Wells was scheduled for surgery at that time. Mrs. Wells inquired at Virginia First whether the credit life insurance policy contained a clause waiving payment of premiums during the disability of the insured, because "he may be out of work for quite a while." She was told, "I'm sorry. We do not find where you have any insurance . . . . There was no application. There is no record of it." Virginia First conceded that it had collected $379.68 in credit life insurance premiums "in error," and credited that amount to the Wells' loan payments. Mr. Wells died on August 10, 1978. The loan balance was then $21,899.33, which

the parties agree would be the measure of Mrs. Wells' damages if she is entitled to recover.

The chief controversy on appeal is whether the trial court erroneously placed upon Virginia First the burden of proving that Mr. Wells was uninsurable in 1973. Mrs. Wells' amended motion for judgment alleges that her husband was in good health on September 5, 1973, and that there was then no reason why any insurance company would have denied him coverage. Virginia First's grounds of defense affirmatively alleges that he was then uninsurable, by reason of a pre-existing condition which he did not disclose. Mrs. Wells testified at trial that he had suffered from arteriosclerosis for which he had undergone surgery in 1971, but that he had thereafter improved, worked regularly, played golf, and was "in very good health . . . . I would say he had no limitation whatsoever." Considerable expert medical testimony was offered with respect to his condition.

Dr. Robert M. Miskimon, a physician who was familiar with arteriosclerosis and who had served as an officer and medical director of a life insurance company and had advised his company's underwriting department on the selection of risks, qualified as an expert in the medical aspects of insurance underwriting. The facts made available to him from Mr. Wells' medical history were ambiguous. In 1971, at thirty-three years of age, Mr. Wells had suffered pain and diminished pulses in his legs. He was diagnosed as having an obstruction in the aorta. On September 27, 1971, he underwent surgery at the Medical College of Virginia which included a plastic graft, bypassing the obstructed arterial area. His recovery was good and uneventful, but in his attending physician's opinion, he still had generalized arteriosclerosis. In 1973, he was symptom-free and was leading a normal life. In September 1976, he again complained of pain in the lower extremities and was found to have a further arterial obstruction in the area of the 1971 bypass graft. He was subjected to further bypass surgery on September 8, 1976, which relieved his symptoms but failed to restore the pulses in his legs. He was then diagnosed as having rapidly progressive arteriosclerosis. This condition led to his death in 1978. Dr. Miskimon concluded from his history that he would, in September 1973, have recommended to his company that Mr. Wells' life be insured, but at an increased premium.

The court instructed the jury that Virginia First had the burden of proving, by a preponderance of the evidence, as an affirmative

defense, that Mr. Wells was uninsurable in September 1973. Virginia First argued in post-trial motions, and on appeal, that this instruction was in error, because Mrs. Wells should have been required to carry the burden of proving that her husband was insurable in order to show that she suffered damage as a result of any breach of contract by it. It also argues that Dr. Miskimon's testimony, being based on 1971, 1976, and 1978 hospital records, involved pure speculation as to Mr. Wells' condition in 1973 and was thus insufficient to carry this burden.

Because the jury's verdict resolved in Mrs. Wells' favor the conflicting evidence regarding the existence of a contract to procure insurance, we granted an appeal limited to the questions whether there had been error in the allocation of the burden of proof and whether the testimony of Mrs. Wells' expert witness should have been struck as too speculative to go to the jury.

Mrs. Wells contends that the risk of non-persuasion on the issue of insurability should be on Virginia First. Having proved to the jury's satisfaction the existence of a contract to procure insurance, and its breach by Virginia First, she claims that she should receive the benefit of the bargained-for coverage unless Virginia First can show that Mr. Wells would have been uninsurable in any event.

Virginia First correctly points out that where a contract to procure insurance is breached, the measure of damages is the amount of loss which would have been subject to insurance, not the amount of insurance applied for. This principle would be dispositive if Virginia First were in a position to stand upon it. But here, Virginia First invited the Wells to apply for credit life insurance, told them it would advise them in writing within ten days if the policy were not issued, and thereafter remained silent, collecting insurance premiums for three years. By its conduct, it concealed knowledge of Mrs. Wells' financial hazard while she was in a position to guard against it by taking other action. Its silence prevented Mr. Wells from seeking insurance elsewhere during his lifetime. The trial court expressly relied on these facts in denying Virginia First's motion to exclude, as speculative, Dr. Miskimon's opinion as to Mr. Wells' insurability in 1973. This was, as appellee contended in oral argument on appeal, "the gravamen of the case."

We shall never know whether Mr. Wells could have obtained life insurance from any insurer, at any premium, in 1973. Virginia

First, having created this ambiguity, will not be permitted to rely on it as a defense to the damages arising from its breach of contract. "One who has been silent when he should have spoken will not be permitted to speak when he should be silent." *National Airlines, Inc.* v. *Shea,* 223 Va. 578, 583, 292 S.E.2d 308, 311 (1982), quoting from *Fitchett* v. *Parsons,* 142 Va. 163, 168, 128 S.E. 457, 458 (1925).

In *Consumer's Financing Corp.* v. *Lamb,* 218 Ga. 343, 127 S.E. 2d 914 (1962), a purchaser of a new car agreed to cover his conditional-sale loan with credit life insurance. The premium was added to the amount of the loan by the finance company. The insurance, however, was never obtained. Notice of this failure was never given to the borrower. After his death, the finance company defended his administratrix' claim by asserting that no damage had actually resulted, since the borrower's physical condition was such that no company would insure him. The court, affirming a summary judgment for the administratrix, held:

> Mr. Lamb was never notified during his life that no insurance could be obtained . . . . He was led to believe that it had been obtained by the conduct of the defendants in repeatedly accepting his payments on the premium therefor without advising him that the insurance could not be obtained . . . and thereby enable him to secure it elsewhere; . . . now, after his death which renders it impossible to undertake to get insurance elsewhere, this defendant, because of its laches in not notifying him while he could make the effort to get it elsewhere, can not in equity and good conscience take advantage of the changed condition which renders the plaintiff unable to do what could have been done had the defendant promptly notified him and questioned his ability while in life to secure the insurance.

*Id.* at 345, 127 S.E.2d at 916. *See also Walters* v. *Bank,* 69 Ohio St.2d 677, 433 N.E.2d 608 (1982).

In *Parnell* v. *First S. & L. Ass'n. of Leakesville,* 336 So. 2d 764 (Miss. 1976), it was held that a lender who collects and retains credit life insurance premiums stands in a fiduciary capacity toward the borrower to see that the amount so charged is actually applied to the purchase of such insurance. *See also Pickett* v. *First Amer. Sav. & Loan Ass'n.,* 90 Ill. App.3d 245, 412 N.E.2d

1113 (1980), *Watkins v. Valley Fidelity Bank & Trust Co.*, 63 Tenn. App. 493, 474 S.W.2d 915 (1971).

The authorities are in general accord that, on facts similar to those at bar, the debtor is not required to prove that he could have obtained credit life insurance from another source, and that his measure of damages is the amount which would have been recoverable if a policy had actually been obtained. *Beiter v. Decatur Fed. Sav. & Loan Ass'n.*, 222 Ga. 516, 150 S.E.2d 687 (1966); *In re Carter's Estate*, 254 Iowa 138, 116 N.W.2d 419 (1962); *Robichaud v. Athol Credit Union*, 352 Mass. 351, 225 N.E.2d 347 (1967); *Keene Investment Corp. v. Martin*, 104 N.H. 518, 191 A.2d 521 (1963); *Park Federal Savings & Loan Assn. v. Lillie*, 24 Ohio Misc. 271, 265 N.E.2d 339 (1970).

We subscribe to the foregoing views. Since Mrs. Wells had no burden of proving that her husband could have obtained credit life insurance in 1973, it is immaterial whether Dr. Miskimon's testimony was sufficient to carry that burden. Thus the answer to the first question on appeal disposes of the second.

For these reasons, the judgment of the trial court will be

*Affirmed.*

COMPTON, J., dissenting.

In this action at law for breach of contract, the majority, incorrectly in my view, has placed the ultimate burden of proof on the issue of damages on the defendant, applying an equitable theory never briefed or argued, and relying entirely on cases never cited by the litigants.

In the amended motion for judgment, filed by Carol M. Wells, individually, and as administrator of the estate of her deceased husband, the widow alleged that on September 5, 1973, the date the loan was closed, "Jefferson Lanear Wells, Jr., was in good health, was insurable, and . . . there would have been no reason for an insurance company to reject his application for coverage." This was an assertive allegation by the moving party in the lawsuit, upon which devolved the procedural obligation to show not only a breach of contract by the defendant but that damages resulted from the breach.

Responding in the grounds of defense, the defendant "affirmatively allege[d] that the plaintiff's decedent was uninsurable on

September 5, 1973 as a result of pre-existing conditions of health which were not disclosed to the defendant at any time on or prior to September 5, 1973." Even though the defendant chose to "affirmatively" plead the defense, this is not a suit against an insurance company to recover upon a life insurance policy; in such a case, the burden to prove misrepresentation by the insured is normally on the defendant. But here, in this suit against a financial institution for breach of a contract to procure insurance, the plaintiff was not damaged unless the decedent was insurable at the time in question. Consequently, proof of insurability was an integral part of plaintiff's claim. Yet, the majority concludes, applying notions of waiver and estoppel not even advanced by the plaintiff, that the defendant, the party upon which the affirmative of the damage issue is not ordinarily imposed, must bear the burden of proving noninsurability. This holding removes the burden of proof from a plaintiff who has ready access to privileged medical information and other facts necessary to prove insurability; instead, it places the burden on a defendant which would have a difficult task collecting evidence of noninsurability. I do not agree, and thus dissent.

COCHRAN and STEPHENSON, JJ., join in dissent.